Jacqueline ANDERSON, et al., Plaintiffs,

v.

WHITTAKER CORPORATION, et al., Defendants.

WHITTAKER CORPORATION, et al., Third–Party Plaintiffs,

v.

BAY HAVEN MARINA, INC., et al., Third–Party Defendants.

No. G81–98 CA5.

United States District Court, W.D. Michigan.

Sept. 11, 1987.

John L. Coté, Willingham, Coté, Hanslovsky, Griffith & Foresman, P.C., E. Lansing, Mich., and Richard Swaney, Swaney & Thomas, Holland, Mich., for plaintiffs.

Jeffrey B. Horton, Lilly, Piatt & Doyle, Kalamazoo, Mich., for third party defendant Ottawa Beach Marina.

Richard B. Baxter and Joel E. Krissoff, Dykema, Gossett, Spencer, Goodnow & Trigg, Grand Rapids, Mich., for defendant Whittaker Corp.

John L. Collins, Foster, Swift, Collins & Coey, Lansing, Mich., for third party defendant Claude C. Boles.

L. Roland Roegge and Bruce P. Rissi, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for third party defendant Bay Haven Marina.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Senior District Judge.

The instant case is a wrongful death action, originally brought by the surviving families and representatives of four decedents against the manufacturer of a boat. Plaintiffs have claimed that, due to defects in the boat caused by defendant's negligence, the four decedents lost their lives while driving the boat across Lake Michigan. Defendants, in turn, have filed a third-party complaint in admiralty, under Fed.R.Civ.P. 14(c), against two marinas that assertedly were the employers of the decedents, and against the owner of the boat. Jurisdiction over the complaint was asserted on the basis of diversity of citizenship, as well as on the basis of admiralty.

An explanation of the various claims and contentions of the many parties requires a brief summary of the underlying facts. Plaintiffs claim that on September 25, 1980, their decedents took off from Montrose Harbor in Chicago on a Trojan F–32 cabin cruiser manufactured by defendants.[1] Decedents allegedly were bound for Holland, Michigan. Plaintiffs claim that the Trojan F–32, which had been given the name "Sea Mar III" by its owner, was at the relevant time the subject of a product recall issued by the manufacturer. They assert that the product was in fact defective, in that the air vents on either side of the stern were constructed in such a way that water could enter the boat and accumulate in the aft bilge. Plaintiffs have asserted that the Sea Mar III (hereinafter simply referred to as the "Sea Mar"), which never reached Holland and has never been found, sank as a result of water accumulation through these vents. They also claim that the four decedents, who have never been seen or heard from by plaintiffs since September 25, 1980, and whose bodies have never been found, were killed due to the sinking.

The complaint alleges counts based upon negligence; gross negligence (reckless, wilful, and wanton conduct); implied warranty; express warranty; and strict liability. Defendants filed an answer to the complaint, admitting that they had manufactured the boat in question but denying other material aspects of the claim. In addition, they filed a third-party complaint in admiralty, under Fed.R.Civ.P. 14(c), against three new parties. The defendants claim that at the time of the alleged accident involving decedents, third-party defendants Bay Haven Marina, Ottawa Beach Marina, and Claude C. Boles were decedents' employers. They claim that Boles was the owner of the Sea Mar at the relevant time.

Whittaker claims that third-party defendants are liable to the third-party plaintiffs for contribution as joint tortfeasors; they also have claimed, under the rule allowing impleader in admiralty, that the marinas and Boles are liable to the principal plaintiffs in the action on theories of negligence and strict liability.[2] The claims against third-party defendants are premised upon allegations that Boles as owner was negligent and also that he owed decedents an absolute duty to provide a seaworthy vessel, and that the marinas are liable for negligence in that decedents were acting within the course of their employment. Defendant Whittaker also filed a counterclaim against decedent Anderson's estate, claiming that as "captain" of the Sea Mar crew Anderson was individually negligent

---

1. Plaintiffs named three defendants in their complaint. The defendants Trojan Yacht Corporation and Trojan Yachts Company are both divisions of the third-party defendant, Whittaker Corporation. Throughout this opinion, wherever reference is made to "Whittaker," or "Trojan," the Court should be understood to be referring to all three defendants.

2. Fed.R.Civ.P. 14(c) allows a defendant in an admiralty case to bring in as a third-party defendant any person who may be liable to the principal plaintiff in the case, and to demand judgment against the third-party defendant in favor of the plaintiff.

in several respects, and that for this reason Anderson is liable as a joint tortfeasor with respect to the claims of the other plaintiffs.

The complaint as originally pleaded contained a demand for a jury. Principal defendants filed a motion to strike the jury demand, stating that insofar as plaintiffs had pleaded their case in admiralty as well as at law, the presence of admiralty jurisdiction precluded any right to a jury. Before this motion was ruled upon, however, plaintiffs and all other parties stipulated to a waiver of the jury demand.[3] The case therefore proceeded to trial before the Court.

Defendants in the case, through their answers to the complaint and subsequent responses during discovery, have narrowed the case down to a few basic issues. Defendant Whittaker in fact conceded that it had conducted a "recall" or "retrofit" campaign on 1974–model Trojan F–32s, in the course of which the manufacturer sent out letters stating that the boat's air vents, as designed, allowed water to enter and to accumulate in the stern of the boat. Defendants have maintained, however, that the defect did not cause the disappearance of the boat and alleged death of the crew, and they further have claimed that plaintiffs cannot show otherwise. Whittaker also has raised issues intended to shift liability, if any is found, to the third-party defendants. It has claimed that if the Sea Mar was "unseaworthy," as plaintiffs have maintained, it is only because third-party defendant Boles removed a stern bilge

pump that a former owner of the boat had installed. Whittaker claims that Boles, as owner of the boat at the time of the incident involving decedents, is strictly liable for the boat's unseaworthiness. Further, the manufacturer has asserted that each of the three third-party defendants is liable as the employer of the decedents; it also claims that Bay Haven Marina is liable because of the fact that it should have had knowledge that the Sea Mar was under a recall at the time of the incident.

The case was tried to the bench over approximately three and a half weeks.[4] During that time the Court heard extensive testimony, both live and through depositions; reviewed numerous exhibits in the form of letters, charts, photographs, and actual debris from the Sea Mar; and took a "view" of a Trojan F–32 cabin cruiser docked in Holland, Michigan. Upon careful review of all of the evidence presented, the Court is compelled to find that plaintiffs have shown that it is more likely than not that the Sea Mar, during the time that decedents were aboard, took on water because of the alleged defect and that the water proximately caused decedents' deaths. The Court's findings of fact and conclusions of law, entered pursuant to Fed.R.Civ.P. 52(a), are set out in the following paragraphs.[5]

*Findings of Fact*

A. Jurisdiction

1. Plaintiffs Anderson & Brower, personal representatives of the estates of two

---

**3.** Plaintiffs in the case filed their stipulation to waive the jury demand in conjunction with a motion for reconsideration of the Court's earlier ruling on a motion *in limine*. The motion *in limine* had been brought by defendants, in order to prevent the admission at trial of certain depositions and/or testimony. The disputed evidence consisted of reports by owners of other Trojan F–32s that they had, under various conditions, experienced water intake on their boats. The Court, after considering the matter at length, found that the lack of similarity between those incidents and the matter at hand did not justify admission of the evidence, in light of the prejudice that would have attended use of the evidence at trial. *See* opinion, March 25, 1986. Plaintiffs, in filing their motion for reconsideration, apparently calculated that the balance under Fed.R.Evid. 403 would require a different result if there were to be a bench trial. They

calculated correctly, for the Court upon reconsideration agreed to allow a limited number of the accounts into evidence. *See* opinion, August 26, 1986.

**4.** Pursuant to agreement of all the parties, the Court bifurcated the proceedings and tried the issue of liability first.

**5.** The Court has made an effort throughout the opinion to segregate factual findings from legal conclusions. However, occasionally a finding of fact may have become incorporated in the Court's conclusions of law, or vice versa. Whenever this appears to have been the case, the Court's statement is to be regarded according to its substance, rather than according to its designation as a "finding of fact" or "conclusion of law."

of the alleged decedents, are citizens of the state of Michigan; plaintiff Miller is a citizen of the state of Indiana; plaintiff Willsey is a citizen of the state of Ohio.

2. Defendants Whittaker Corporation and Trojan Yachts Company are California corporations with their principal places of business in California and Pennsylvania, respectively. Defendant Trojan Yacht Corporation was, before its dissolution, a Pennsylvania corporation with its principal place of business in Pennsylvania.

3. Third-party defendant Claude C. Boles is a citizen of the state of Illinois. Third-party defendants Bay Haven Marina and Ottawa Beach Marina are Michigan corporations with their principal places of business in Michigan.

B. Circumstances of the Sea Mar's Departure

4. On September 25, 1980, the four decedents, Curt Anderson, Michael Stevenson, Steven Brower, and Harvie Willsey, attended the IMETC marine trade show at McCormick Place in Chicago. Decedent Curt Anderson was employed at the time as the manager of Ottawa Beach Marina, in Holland, Michigan, a job he had held since 1975. Anderson also worked as a salesman for Bay Haven Marina, also located near Holland. Decedent Steven Brower also was a salesman for Bay Haven. Decedent Michael Stevenson was an employee of Bay Haven; he worked in the marina store. (M. McMahon deposition at 11–12.) Decedent Harvie Willsey was not employed by either marina, but he was a friend of the other three and had extensive boating experience.

The IMETC marine trade show is an annual event, attended as a matter of course by members of the boating industry. The three decedents who were employed by the marina had gone to the show in furtherance of their businesses, which involved the sales of boats and boating products.

5. Prior to that date, decedent Anderson had arranged to handle the sale of a Trojan F–32 cabin cruiser, 1974 model, for defendant Claude Boles. This boat had

been named the Sea Mar III. Boles was the fourth owner of the Sea Mar. He was at the same time engaged in the purchase of a 42–foot Grand Banks; Anderson was handling this sale as well. Anderson was known to Boles as a salesman for Bay Haven Marina in Holland, Michigan. (Boles deposition at 139–40.) Boles had no knowledge at that time that Anderson also was employed at Ottawa Beach Marina, nor did he believe that Ottawa Beach was in any way involved in his transactions. (Id. at 138–39.) As part of the arrangements involving the sales of the two boats, Boles was to relinquish possession of the Sea Mar so that it could be sold by Bay Haven at its Michigan marina. (Boles deposition at 14.) Bay Haven, through Anderson, had agreed to forward the purchase price, less its commission, to Boles after a sale had been made. (Id. at 12–13.)

In the course of final discussion over the telephone concerning the proposed transactions, Anderson offered to transport the Sea Mar from Chicago to Holland on the day that he had planned to be in Chicago for the marine trade show. This offer was not solicited by Boles, who had planned to take the boat across to Holland himself, and who in fact already had had maintenance work done on the boat in anticipation of making the crossing. (Id. at 109.) This conversation took place five days before the date of the show, or on Saturday, September 20. It was agreed that on the following Thursday, September 25, Anderson would meet Boles at Montrose Harbor in Chicago, when Anderson would take possession of the boat in order to transport it to Bay Haven Marina and hold it for ultimate sale. (Boles deposition at 22.)

On September 24, decedent Anderson discussed with decedents Brower and Stevenson plans for bringing the boat back over Lake Michigan on the following day. Originally, decedents had considered bringing Anderson's and Brower's wives along for the cruise across the lake. It was ultimately decided that the three decedents, along with their friend Harvie Willsey, would travel to Chicago by car on September 25

and return on the Sea Mar, across the lake, that same evening.

6. On the day of the boat show, decedents were seen at McCormick Place by Michael McMahon and his wife, Sue McMahon. The McMahons also were in the business of dealing in marine merchandise, and they were acquainted with decedents Anderson, Brower and Stevenson through dealings with Bay Haven. (M. McMahon deposition at 12–13.) The McMahons saw the decedents twice during the day; first, in the middle of the day while the McMahons were eating lunch; and second, between 3:30 p.m. and 4:30 p.m. (EDT). (*Id.* at 7–8.) Decedents discussed with the McMahons their plans to transport the Sea Mar across the lake later that afternoon and were observed to carry duffel bags and jackets. Mike McMahon discussed with Steven Brower the fact that the sky looked overcast, but that there was not a great deal of wind. (*Id.* at 8.) The McMahons received the impression from decedents that the boat trip was regarded as a "novel way of coming home," and a combination of business and pleasure. (*Id.* at 17.) The decedents were not observed to consume any alcoholic beverages. (S. McMahon deposition at 7.)

7. The decedents received a ride from McCormick Place to Montrose Harbor from Vaile Scott. Scott had made arrangements to meet Anderson at McCormick Place that afternoon, in order to exchange some papers in connection with the purchase of a sailboat. (Scott deposition at 6.) During the drive to Montrose Harbor, Scott discussed with the four men their route back to Michigan; decedents indicated that they were going "straight across," and that they expected to reach Holland by 10:00 p.m. (EDT) that evening. (*Id.* at 10.) Scott noticed many thunderclouds in the sky at that time, but did not recall any discussion about them other than perhaps a brief com-

ment. (*Id.*) Scott also noted that the decedents carried light bags and foul weather gear, and he stated that the men did not appear to be in any way intoxicated or "high." (*Id.* at 15, 17.)

8. At Montrose Harbor, decedents were met by Claude Boles. Boles was introduced to the three men with Anderson, and he spent approximately 30 minutes with them going over the features of the boat. (Boles deposition at 39.) One of the decedents looked in the engine compartment. Boles handed over the keys and pointed out such things as the location of the radio and the life preservers. (*Id.* at 42.) Boles informed decedents that, based upon his calculations, there was slightly over half of capacity, or 160 gallons of fuel in the tanks.[6]

Boles watched the four decedents leave the dock at Montrose Harbor at approximately 4:00 p.m. (Chicago time). The Sea Mar proceeded out of the harbor, with Anderson at the helm, in what Boles described as an "easterly" direction, which looked to Boles as though decedents were heading straight across the lake to the Michigan shore, rather than directly towards Holland. (*Id.* at 47.) The boat was being driven on plane, at a speed of 22–25 m.p.h. Boles watched the boat for about ten minutes; after that, he never saw the boat or any of its crew again. (*Id.* at 48–49.)

9. The weather over Lake Michigan earlier that day had consisted of calm conditions, interrupted by several late summer "squalls." David Haase, who sailed from Holland to Chicago during the day on September 25, noted that he passed through at least two sudden storms, marked by rain, heavy winds and hail. (Haase deposition at 27–28.) At one point during his trip, Haase noted waves that were eight to ten feet in height. (*Id.* at 27.) When Haase sailed into Chicago, at between 5 and 6 p.m.

---

**6.** Boles was not specifically asked during his deposition whether the decedents had inquired as to the amount of fuel on board. The Court finds, however, that in light of the decedents' training and experience, and in light of the length of the voyage they were about to undertake, it is inconceivable that they would not

have so inquired. Based upon Boles' testimony during his deposition, which was read into evidence at the trial, the Court finds it most likely that he responded by stating, as he did in the deposition, that *according to his method of calculation, which did not include reliance upon a gas gauge, there were 160 gallons in the tanks.*

(EDT), conditions were calm and there were no small craft warnings posted. (*Id.* at 53–54.)

Observers from the shore in Chicago noted that the sky late that afternoon was overcast, with scattered clouds. (Scott deposition at 18; M. McMahon deposition at 18; S. McMahon deposition at 9.) Boles remembered that, looking out from the harbor at the approximate time of decedents' departure, he noted that the sky contained "tall thunderheads." There had been a few drops of rain, and Boles' wife had driven through a small hail storm on her way to Montrose Harbor shortly before 4:00 p.m. (Chicago time). (Boles deposition at 49.) Boles opined that the conditions looked as though storms were brewing, and he stated that, being a cautious boater, he would not have started across the lake at that time. (*Id.* at 49–50.)

Decedents were not overly concerned about the weather conditions. (Scott deposition at 10; M. McMahon deposition at 18.) There is no indication that before their departure they made specific inquiry into the weather forecast for lower Lake Michigan for the evening. Two of the decedents made calls to their spouses in Holland prior to departure from Chicago; Jacqueline Anderson Goodson stated that she received a call from her husband at approximately 5:00 p.m. (EDT). Anderson apparently asked about the lake conditions on the eastern side of the lake, and was told that Lake Macatawa, which empties into Lake Michigan north of Holland, looked "glassy." Steven Brower spoke to his wife, Martha Brower Walker, at about the same time. Brower informed his wife that the decedents planned to go straight across the lake, but that they would follow the shoreline if the weather became rough.

10. Decedent Anderson was described by all witnesses who testified on the subject as an experienced boater. He had attended the maritime academy for one year, and had been a member of a coast guard for four years, where he attained the rank of bosun mate. He was a member of the coast guard reserve after his active service. He had been stationed at the Holland search and rescue station and had piloted many search and rescue calls. As part of his employment with the two marinas, he had extensive experience operating many different types of pleasure craft. His widow described him as a "dependable" boater, and stated that although he was not a mechanic, he was able to handle small engineering problems that arose on the boats.

The other decedents also had boating experience. Decedent Brower also was a salesman at Bay Haven, and as part of this job he spent considerable time demonstrating different types of boats. (M. McMahon deposition at 15.) He was observed on many occasions handling either power boats or sailboats. (*Id.*) Decedent Stevenson, who worked in the marina store at Bay Haven, dealt in power boat equipment such as pumps, motor parts and engines. He was seen by the McMahons driving a boat on the lake on occasion. (*Id.*) Finally, decedent Willsey, although he had no employment relationship with either of the two marinas, was known by Jacqueline Anderson Goodson to have had extensive boating experience. He held a pilot's license, and had been observed by Goodson on one occasion reconstructing a broken-down car engine. She remarked that Willsey had gone boating with her husband many times, that he was "always" in the bilge of his boat, and that he was very "particular" about his boat.

11. During the evening on Thursday, September 25, 1980, the wives of two of the decedents, Jacqueline (Anderson) Goodson and Martha (Brower) Walker, had dinner with another friend at a restaurant overlooking Lake Michigan near Holland. By the time dinner was over, the three noticed that conditions over the lake were much more windy and turbulent than they had been before. The water looked sufficiently rough to the women that Martha Brower went down to the lake and tried to raise the Sea Mar by means of a marine radio on a boat moored at the dock. However, she was unable to find an operable radio.

12. The Sea Mar did not reach Holland at the expected time, which was around

10:00 p.m. on the evening of September 25. The decedents and the boat still had not appeared by 7:00 a.m. the next morning, and the wives of two of the decedents contacted the local coast guard station. The coast guard commenced a search for the Sea Mar and its crew at about 11:00 a.m. on that day, which was Friday, September 26. By the following Sunday, September 28, the coast guard began to find various items of debris that were later identified by Claude Boles as parts and equipment from the Sea Mar.

13. Between September 28 and early October of 1980, items of debris were found at locations between South Haven and Saugatuck, Michigan. The items were: several orange-colored personal flotation devices (PFD's); one seat cushion that came from the dinette area, which was in the lower cabin of the boat next to the galley; two bench cushions from the fly bridge, one with vinyl covering intact and the other with no cover; a section of vinyl-covered plywood from an inside panel of the fly bridge; a marine signal kit, which had been kept on the fly bridge of the boat, containing a flare gun and several apparently unused flares; two large hatch covers from the floor of the main cabin, one with an unexploded halogen fire extinguisher attached to the underside; one small hatch cover from the center of the main cabin floor; and a ring buoy inscribed with the words "Sea Mar III." All items except for the ring buoy had been found afloat on the lake, a short distance from shore. All were identified by Claude Boles as items that were known to him to have been aboard the Sea Mar when it departed Chicago and was last seen by him on September 25; most of the items bore some distinctive features that enabled Boles positively to state that they were from his boat.[7] None of the items of debris showed signs of fire or explosion.

14. A memorial service for the four decedents was held at Dimnent Chapel, Hope College in Holland on October 11, 1980. Certificates of presumptive death were issued for Anderson, Brower and Stevenson by the state of Michigan on December 22, 1980. (Plaintiffs' exs. 18–20.) A judgment of presumptive death was entered by a probate court in Ohio as to decedent Willsey on January 12, 1981. (Plaintiffs' ex. 21.)

15. The hull of the Sea Mar has never been found, nor have the bodies of any of the four decedents. The wives of decedents Anderson and Brower have not seen or heard from their husbands since September 25, 1980. The Court finds that it is more probable than not that the Sea Mar in fact sank somewhere on Lake Michigan in the vicinity of South Haven. The Court further finds it most likely that all four of the crew members died at that time.

C. Evidence of conditions during the Sea Mar's crossing

16. The Sea Mar III was a 1974 model 32–foot cabin cruiser, equipped with two Chrysler engines. The boat had been owned by Claude Boles since 1977, and during that time one of the engines had been partially rebuilt. (Boles deposition at 23.) On September 25, 1980, when Boles turned possession of the boat over to Anderson and his mates so that they could transport the boat to Holland, the boat had one automatic bilge pump located in the forward bilge. (*Id.* at 24.) That pump was relatively new, having been installed by Boles to replace the pump that formerly was in the forward bilge. (*Id.*) The boat had one bilge, extending the length of the hull, which was separated by bulkheads open at the bottom. Water therefore was enabled to run the length of the boat with no impediment. (*Id.* at 25.)

The boat could be steered either from the main steering station, located in the central cabin or "main salon" of the boat, or from the fly bridge up above. (*Id.* at 24.) The engine compartment was located directly beneath the central cabin floor, and it was accessible through four hatch covers. (*Id.* at 28.) Two of the hatch covers were located in the center of the floor; the two side

---

7. For example, Boles' wife identified the PFD's by the way the straps were tied, which apparently was a distinctive way in which she had left them.

hatch covers, which were larger, sat underneath the helmsman's chair (on the starboard side), and a couch (on the port side). (*Id.*)

The Sea Mar was equipped with a 12–channel radio with "excellent range." (*Id.* at 27.) The radio took power from the main batteries, and it was located at the main cabin steering station. It also could be operated from a remote location on the fly bridge. (*Id.* at 31.32.) There were two compasses, one located at each steering station. (*Id.* at 28.) The boat had full charts aboard. There were three batteries, one hooked directly to each engine, and one to the main generator. (*Id.* at 34.) The Sea Mar was stocked with at least eleven PFD's (lifejackets): six on the fly bridge, and at least five in the main cabin. (*Id.* at 26.) There was a halogen fire extinguisher located under one of the large hatch covers, and two manual fire extinguishers in the main cabin. (*Id.* at 31.) A hand bilge pump was stored in a closet near the galley. (*Id.* at 119.) There were no life rafts or dinghies on board. (*Id.* at 27.) The boat had navigation lights, running lights, and a mast light. (*Id.* at 36–37.) It had four gas tanks, two main and two reserve. Two tanks fed each engine directly, but the tanks were interconnected so that fuel could be supplied from either set of tanks to either engine. Total fuel capacity according to Boles was 250 gallons; there were two fuel gauges on board, one for each pair of tanks. (*Id.* at 40.) Boles stated on deposition that at cruising speed he achieved mileage of about .92 miles per gallon. (*Id.* at 44.)

17. Boles gave the decedents what he termed a thorough, "stem to stern" review of the boat's mechanical systems before decedents departed. (*Id.* at 41–42.) He specifically remembered showing them the location of the radio and the life preservers; he showed one of the decedents the engine compartment. (*Id.* at 39.) He remembered going over in "detail" with Anderson the procedure for switching the fuel tanks when one set indicated diminished reserves. When decedents took possession of the boat, it was set to draw fuel from the rear tanks. In order to switch the fuel source to the forward tanks, the valve on the forward tanks had to be switched open, and the valve on the rear tanks closed. In order to close the rear tanks, one had to reach down into the rear bilge, under the rear hatch in the very stern of the boat. (*Id.* at 106–07.)

18. The Sea Mar had been serviced only two days prior to the date it departed for Michigan. Boles stated that on Tuesday he had taken the boat to a marine service outfit, in the Chicago area, for work on the starboard engine. The distributor, which was rusty, was cleaned out; the mechanics also cleaned the points, installed a new rotor and a new distributor cap. (*Id.* at 108.) Boles also had recently checked the oil. (*Id.* at 39.)

19. Boles stated in deposition that there were "about" 160 gallons of fuel on board at the time that he handed the Sea Mar over to the decedents. (*Id.* at 40.) This conclusion was not reached by reliance on the levels shown on the gas gauges, but by his "basic hours use and [his] experience of what [the boat] used." (*Id.*) He did not recall what the gauges in fact showed for fuel levels at that time. Boles stated that he kept a log showing fuel and hours, which he relied upon to determine the gas levels. The log apparently was not on the boat at that time, as Boles stated at his deposition that he still had it. (*Id.*) Boles remembered checking the estimate again sometime after the accident, and he stated that he was "quite confident" in his original calculation. (*Id.* at 41.)

For several reasons, however, the Court cannot accept Boles' estimate of the fuel level as a definitive statement on the subject. First, Boles' conclusion is based upon his memory of a calculation made from information that the Court has not seen.[8] The Court has no way of assessing the reliability of Boles' method of judging fuel

---

8. Boles' fuel and hours log was not introduced into evidence, nor did he explain at his deposi- tion his method of keeping track of the data.

levels. As Boles' estimate is only as good as the information that it is based upon, the Court is unable to give his estimate full credence without more facts. Further, and even more significantly, Boles stated that he had had the boat fueled "recently" before Thursday, September 25. (*Id.*) However, he did not relate *how* recently, and he also stated that he had had the boat serviced only *two days* before the incident, and that he had not taken the boat out since it was serviced, or apparently run the engine since then. (*Id.* at 108.) Boles' calculation of the fuel level takes no apparent account of the fact that the boat had been out of his possession only a short time before, probably *after* the last time it had been fueled. There is a strong possibility that fuel was used in running or checking the engines at the time the boat was repaired. In light of this, the Court can find only that, although it is possible that there were as many as 160 gallons of fuel in the boat at the time it left Chicago on September 25, it is equally possible that there was a significantly smaller quantity of fuel on board.

20. All 1974 model Trojan F–32s, including the Sea Mar, had been the subject of a manufacturer's recall and retrofit campaign between 1978 and 1979. Since 1974, the defendant had been aware that operators of the boats had experienced water entry through the aft air vents. The F–32, as originally designed, had aft air vents equipped with cowls that faced forward, and it had no bilge pump in the stern. The manufacturer in its recall notice stated that sustained operation under certain conditions of wave height, direction, attitude, speed and other variables could allow water to enter through the aft vents in sufficient quantities to "disable the engines and eventually swamp the boat." The manufacturer recommended that owners of F–32s, 1974 models, install bilge pumps that it offered to provide in the aft sections of their boats.

The defendant's recall campaign was not publicized through the media or otherwise made known to the general public. Letters instead were sent by Whittaker to Trojan dealers and to purchasers, specifically first purchasers and those subsequent purchasers known to the manufacturer. The recall campaign was monitored by the United States Coast Guard. The first owner of the Sea Mar, Robert Olszewski, never received notice of the recall/retrofit campaign; likewise, Claude Boles, who was but the fourth owner, was unaware of the recall or of the fact that the manufacturer had determined that the boat had a need for an aft bilge pump. (Olszewski deposition at 44; Boles deposition at 117–18.) Boles therefore did not discuss the matter with the decedents. (Boles deposition at 118.)

The parties have stipulated that it would have been feasible for the manufacturer to have designed the F–32s' air ventilation system so that the air vents were not mounted on the sides of the hull. They also have stipulated that the boats had been designed for operation on large bodies of water, including the great lakes, in "foreseeable" weather conditions.

21. Neither Bay Haven Marina nor Ottawa Beach Marina, third-party defendants, were authorized Trojan dealers at the time of Whittaker's recall campaign. They did not receive notice of the campaign, or of the manufacturer's proposed retrofit, prior to the date of the decedents' disappearance. Their employees, therefore, cannot be charged with notice of the recall prior to the accident.

22. Both plaintiffs and principal defendants presented expert testimony on the subject of the weather conditions that existed over southern Lake Michigan on the evening of September 25, 1980. Plaintiffs introduced the testimony of Conrad Gosset, a meteorologist.[9] Gosset reviewed

---

9. Gosset referred to himself as a "consulting meteorologist," who has had experience as a weather officer in the United States Air Force, and as a staff meteorologist for a television station. He was stationed at Sault Ste. Marie, and has had experience assessing weather conditions on the Great Lakes. He now runs a small consulting operation, which is engaged primarily in the business of providing past weather information. The Court is satisfied

empirical findings from several land-based coast guard stations, airports, and ships that had crossed Lake Michigan on that date. The data collected chiefly concerned wind speed and direction and wave height, at various times from late September 25 through early September 26.[10] On the basis of these various findings, Gosset compiled his own estimates of actual wind speeds and wave heights over the entire southern one-third of Lake Michigan at specified times. His conclusions were as follows:

| Time (EDT; 9/25/80) | Wind Speed | Average Wave Height |
|---|---|---|
| 7:00 p.m. | 15–20 knots; NW | 2 ft. |
| 8:00 p.m. | 20–25 knots; NW | 3 ft. |
| 9:00 p.m. | 20–30 knots; NW | 3–5 ft. |
| 10:00 p.m. | 25–35 knots; NW | 3–6 ft. |
| 11:00 p.m. | 25–35 knots; NW | 3–6 ft. |

(Plaintiffs' ex. 288.) Gosset's wave height estimates were expressed in terms of "average" wave heights, which he stated represented an average of *all* various wave heights present at a given time, not just the highest or lowest waves. He also stated that in reaching his estimates of wind speeds over the lake, he made no adjustment of the wind speed measurements taken over land to account for differences in friction and other factors that might not be present over water. His avowed reason for this was the "consistency" he noted between the wind speeds taken on shore, and those recorded at the offshore locations (*i.e.*, the transiting ships).

Gosset also reviewed, in preparation for his trial testimony, weather forecasts for the given date that had been prepared and disseminated by the National Weather Service. These forecasts were not used by him in preparing his data summary. He noted that at approximately 5:40 p.m. (EDT) on September 25, "increasing" winds out of the north-northwest at 23–33 knots were forecast, along with wave heights of from four to seven feet. He noted that by 7:00 p.m. (EDT), a small craft warning was in effect for the lower part of the lake.

The defendants' weather expert, Dr. Guy Meadows, was not a meteorologist but a marine engineer.[11] He stated that in his review of the weather data, he had discarded as unreliable all estimates of wind speed and wave height that were taken from shore-based locations. His reason for doing so was the conclusion that such observations cannot accurately reflect conditions over nearby bodies of water, because of the fact that the observations are affected by the proximity of the shore. In particular, Meadows noted that wind measurements taken over land usually will produce lesser values than wind speed measurements taken over water would be, because of additional friction and drag caused when the wind moves over land. Meadows also noted that wave height measurements taken from shore are distorted by the configuration of the lake bottom near shore. He expressed serious doubts as to the accuracy of wave height measurements based upon visual observation alone, noting that such estimates are subject to "wide variation."[12]

that Gosset fulfills the requirements that an "expert," under Fed.R.Evid. 702, be qualified by "knowledge, skill, experience, training, or education." Therefore, it will receive his testimony as that of an expert.

10. Gosset relied upon weather data received by coast guard stations and airports at inland locations all around the perimeter of the lake. The locations extended from Manitowoc, Wisconsin on the northwest side, down the Wisconsin coastline to the Chicago area, across northern Indiana (Ogden Dunes, Michigan City), and up Michigan's western coast as far north as Ludington. He also relied upon data from several ships that had passed through the southern part of the lake on the evening of September 25. The data had been obtained from files kept at the National Climatic Data Center in Asheville, North Carolina.

11. Meadows testified that he was an associate professor at the University of Michigan in the field of physical oceanography, and that he had done extensive research in the area of weather conditions on the Great Lakes. Again in reliance upon Fed.R.Evid. 702, the Court finds that he is qualified to testify as an expert in these areas.

12. According to Meadows, observations of wave height made by seamen on transiting freighters tend to err on the "low side." Meadows attributed this to the bad vantage point on such vessels for taking wave measurements, the fact that the seamen taking the measurements frequently are distracted by other duties, and the undisputed tendency of Great Lakes' vessels to avoid bad weather and heavy seas whenever possible.

Meadows therefore discarded much of the empirical data that was relied upon by Gosset. Meadows concentrated instead upon the wind speed measurements taken by the ships crossing the lake, which he believed had been reached by reliance upon objective instruments. He also took into account readings made by a weather buoy that was in place in northern Lake Michigan on September 25, 1980.[13] Based upon this information, Meadows used theoretical means to reach his own conclusions as to wave heights in the southeastern section of Lake Michigan, specifically off the coast of South Haven, late on the crucial date. These conclusions are as follows:

| Time (EDT; 9/25/80) | Wind Speed | Significant Wave Height |
|---|---|---|
| 9:00 p.m. | 24 knots | 6.0 ft. |
| 10:00 p.m. | 24 knots | 6.8 ft. |
| 11:00 p.m. | 25 knots | 7.0 ft. |
| 2:00 a.m. (9/26/80) | 25–30 knots | 7.8 ft. |

The salient characteristic of Meadows' conclusions, as distinguished from those of Gosset, is his use of the term "significant wave height," rather than average wave height, to express his findings. Meadows defined "significant wave height" as the average of the one-third *highest* waves present on the water at a given time, rather than an average of all visible waves. Insofar as the value is an average, it allows for the existence of waves that are greater than the average value, as well as waves that are smaller. Meadows testified that with a significant wave height of 7 feet, for example, one can predict that a 10–foot wave will occur approximately every six minutes; a 12–foot wave every 25 minutes; and a 15–foot wave every six hours. A significant wave height of 8 feet will yield, according to statistical prediction, a 10–foot wave every three minutes; a 12–foot wave every 10 minutes; and a 15–foot wave every two hours.[14]

Defendants, relying upon Meadows' testimony, ask the Court to reject the conclusions of Gosset, which are based solely upon reported data. They state that Meadows' testimony demonstrates that the data relied upon is inaccurate. Plaintiffs, on the other hand, urge the Court that Meadows' results are too theoretical, and state that it should rely on the empirical results instead. The Court first notes that, in many respects, the results reached by the two experts are not inconsistent with each other. This is true for two reasons: first, because the results of Meadows were intended to provide values only for the very southeastern part of the lower lake; specifically, ten square miles off the coast of South Haven, Michigan. Gosset admitted that, with winds coming out of the northeast as he had concluded, wave heights would be highest in the southeastern portion of the lake, even though his results were not specific other than to the southern third of the lake. Meadows stated that his use of a theoretical method of calculating wave heights allowed him to be very specific as to location.[15] Second, Gosset and Meadows

13. This buoy took measurements of wind speed and direction, wave height, temperature, and frequency of waves, among other readings. It was located approximately 200 miles north of the rhumb line between Chicago and Holland, Michigan.

14. Plaintiffs' counsel made an extended effort during cross-examination of Meadows to impeach the witness by means of a statement made during deposition. Counsel referred to page 43 of the deposition transcript, where the witness was asked for the "maximum wave height" for the period of time in question. In response to this question, the witness stated that the maximum wave height was 7.8 feet. The Court does not find, however, that by making this statement the witness in any way meant to imply that a 7.8–foot wave would have been the highest wave actually experienced, nor that he meant to abandon his earlier contention that he

was speaking in terms of *averages*. The statement clearly was made during the course of a conversation in which the witness was speaking of "significant wave heights," and it is clear that in referring to a maximum wave height, he in fact was referring to the highest significant wave height calculated.

15. Meadows stated that wave heights in any given location will be determined by three variables: the wind speed; the duration of the wind's contact with the water; and the distance over which the wind moves (the "fetch"). Waves are the product of energy transferred from the air to the water, and this transfer is a process that takes place over time; as energy first is transferred to the waves the result is "rising seas," with "fully risen seas" resulting when the transfer is complete. Because distance is a component in determining wave height, it stands to reason that the waves will be

expressed their conclusions as to wave height in significantly different terms. In light of these factors, it is not inconsistent to find, for example, that at 9:00 p.m. on September 25, the average wave heights for some parts of the southern one-third of the lake was from three to five feet, with waves in the extreme southeastern portion of the lake reaching a significant wave height of six feet.[16]

The Court finds, however, that to the extent that Gosset's proposed data is intended to reconstruct conditions in all parts of the southern portion of the lake, it must reject his conclusions in favor of the more specific conclusions of Meadows. The Court's reasons for this are two-fold. First, it notes that the transiting vessels that took wave height readings, which were the only sources Gosset relied upon from on the lake, all took their readings from the western part of the lake. (*See* plaintiffs' ex. 291.) Gosset, however, admitted and Meadows confirmed that wave heights would be greater in the eastern part of the lake. Second, Meadows' method of calculation, although "theoretical," has been empirically tested.[17] He stated that many of the weather buoys now in place in Lake Michigan were installed in response to the sinking of the Edmund Fitzgerald in November of 1975, after which it was observed that land-based weather data in many cases is inadequate to predict weather conditions over the water. The Court concludes therefore that Meadows' specific hindcasts, expressed in terms of significant wave heights, more probably than not reflect the actual sea conditions off the coast of South Haven at the stated times.

23. This conclusion concerning the high winds and heavy seas is corroborated by reports from persons who had occasion to observe weather conditions from the eastern shore of Lake Michigan on the night in question. James Bradley, who at approximately 9:30 p.m. (EDT) was at his home on the shore of Lake Michigan, one-and-a-half miles north of the South Haven harbor, remembered that the night was "extremely windy." (Bradley deposition at 9.) He stated that the glass in a picture window facing the lake was "bowing in" because of the wind. Bradley observed that he would not have taken his 50–foot commercial tugboat out that night, because of the rough conditions. (*Id.* at 16.) Michael and Sue McMahon, who were driving north that evening on I–196, which is near the lake, remembered increasingly heavy winds and severe weather, including rain, thunder and lightning, roughly between St. Joseph and Holland.

24. The evidence in the case shows some conflicting indications concerning the route taken by decedents when they embarked for Holland from Chicago. Repeated statements made by various of the decedents to the McMahons, and to the wives back in Holland, revealed the intention to take a direct route across the lake. This intention also is reflected in the decedents' estimated time of arrival of 10:00 pm (EDT), which would have allowed for the four to five-hour trip required if they were to go straight across. On the other hand, Boles stated on deposition that he observed the decedents drive out of Chicago in an "easterly" direction, more south than the route that would have led directly to Holland.[18]

---

higher in areas that are farther from the direction in which the winds originate (in this case, the northwest section of the lake).

16. The wind speed values given by Meadows also are on the low end of the ranges for wind speed given by Gosset. Meadows accounted for this discrepancy by stating that his values were lower because he had averaged them over the entire lake.

17. Meadows testified that the method of calculation relied upon by him has been tested by use of a weather buoy located in Lake Erie, and

found to be accurate in providing readings of actual wave heights.

18. David Haase stated in his deposition that when he sailed into Chicago late in the afternoon of the 25th of September, he observed what he though was a power boat heading in the direction opposite to him, northeast toward Michigan. He thought that the time must have been close to 5:00 p.m. (CDT). Haase stated that he could not make out any specific characteristics of the boat, other than the fact that it had its lights on. (Haase deposition at 33–34.) There is little evidence to convince the Court

The Court finds that it is most likely that decedents did depart from Chicago intending to drive directly across to Holland. Boles only observed them for a short time, during which they probably had not set the course that they would follow once they got farther from land. In the Court's estimation his observations are not sufficient to rebut the strong inference, raised by the other evidence, that decedents did in fact take a more or less northeasterly course across the lake, that being the most direct route to their destination.

25. James Bradley testified (by deposition) that at approximately 9:30 pm (EDT), give or take 15 minutes, he heard a transmission over channel 16 on his marine band radio stating "Grand Haven Coast Guard, this is the Sea Mar." (Bradley deposition at 4.) Bradley at the time was sitting in his home overlooking Lake Michigan. Bradley stated that his radio, which was a portable, hand-held unit with "very limited range," could pick up signals from a maximum of 10–12 miles away. (*Id.* at 8.) He stated that he heard no response to the Sea Mar's signal, nor did he hear any further transmission in which the vessel was identified. He remembered that the voice making the transmission was a male voice, and that it was calm and contained no accent or other distinguishing characteristic. (*Id.* at 18–19.) He did not construe the message as a distress call.

26. Donald Olson and his daughter, Kimberly Olson DuBois, both stated on deposition that on September evening in 1980, date uncertain, they were putting shingles on their boathouse on the lakeshore south of South Haven when they both saw a "bright light" out on the lake. Each of them testified that the light was a single light, unwavering, which did not resemble a flare. (Olson deposition at 8–9; DuBois deposition at 9.) They each stated that the light did not appear to move, and that it was in place for at least several minutes. (Olson deposition at 9: DuBois deposition at 11.) They estimated that it was located northwest of their location, which was on the shore approximately one mile south of South Haven. (Olson deposition at 12; DuBois deposition at 12.)

Neither one of the deponents could remember the exact date of the occurrence. Donald Olson did state that the next morning he heard a radio announcement concerning the search for the missing Sea Mar; Kimberly DuBois testified that the next day she read about the missing boat in the newspaper. (Olson deposition at 11; DuBois deposition at 13–14.) In light of the fact that the coast guard search for the Sea Mar did not begin until about 11:00 on the day after the disappearance, however, the Court concludes that it is unlikely that the Olsons in fact saw the light on September 25. It therefore concludes that the light was unrelated to the Sea Mar or its crew.

27. The conclusion that the Sea Mar was within 12 miles of South Haven at 9:30 pm clearly is not fully consistent with a finding that the decedents followed the rhumb line from Chicago to Holland until the time of their disappearance. The direct line between Chicago and Holland comes only within approximately twenty miles of South Haven. The unavoidable conclusion, therefore, is that at some point after the departure for Michigan, decedents for some reason departed from the route they had set out on. The location of the debris identified as being part of the Sea Mar, primarily between South Haven and Saugatuck, supports the conclusion that at some place north of South Haven decedents had cut in much closer to shore than their direct route would have taken them.

D. Instances of water intake on other Trojan F–32s

28. The plaintiffs in this case attempted to illustrate the nature of the water intake

that this vessel was the Sea Mar, however; in fact, although Haase is extremely vague about time and distances, it appears that the boat he saw was too close to Chicago to have been the Sea Mar. Haase stated that the power boat was a "little bit" further out of Chicago than a sail-

boat he had seen earlier, just beyond the outer breakwater. (*Id.* at 33.) By 5:00 p.m. (CDT), however, assuming the 4:00 p.m. departure time, calm conditions and speed already established, the Sea Mar would have been a good twenty miles out of Chicago.

problem, the subject of the defendant's recall letter discussed above, by introducing the depositions of the owners of several other Trojan F–32s, 1974 models. These boats all were subject to the recall instituted by Whittaker. The testimony detailed occasions on which the boat owners, out on various bodies of water, had experienced water intake that they determined was due to the admitted air vent defect. Plaintiffs would have the Court find that these examples of water intake illustrate the circumstances that give rise to such an occurrence; i.e., speed of boat, attitude, type of seas, course to the seas and other variables. The plaintiffs would have the Court further conclude, based upon this information, that the predicate conditions were present during the trip made by the Sea Mar, and therefore that water intake of the type chronicled by the other boat owners crippled the Sea Mar and caused it to swamp and to sink.

The Court finds that the various accounts by other boat owners, which are eight in number, are marked primarily by their dissimilarity to one another. The details concerning wave height; type of sea; amount of water taken on; attitude of the boat; indicate that no single variable is always present when water intake has occurred. For example, the deponents reported wave heights that ranged from one to one-and-one-half feet (Heuman deposition at 11); two to three feet (Lorenz deposition at 25); four to six feet (Kalajian deposition at 14); to six to eight feet (Raub deposition at 29). The amount of water taken on ranged from eight inches in the stern (Heuman deposition at 9); to 20–24 inches in the stern (Raub deposition at 19); to levels sufficient to reach the engine shafts in the middle compartment (Hackert deposition at 10). Water entered at different rates: one owner took on eight inches of water after an hour and a half (Heuman deposition at 9); another took on over twenty inches of water after only about 30 minutes (Raub deposition at 19). Many of the deponents stated that the phenomenon occurred when they took the seas on the

quarter bow; two reported that it occurred with following seas (Heuman deposition at 11; Hackert deposition at 26). Most of the owners experienced the condition while traveling across open water; one, however, reported it after following the shoreline (Heuman deposition at 9).

The Court finds that these depositions, even taken as a group, are not particularly helpful in providing the fact finder with a means by which to predict what predicate circumstances are necessary for water intake. They serve to demonstrate that it is the combination of circumstances, rather than any one particular circumstance, that make the phenomenon possible.[19] Only a few specific facts can be gleaned from the other owners' testimony. First, all of the experiences related show that the water intake was the result of the movement of the boat through the water, and that as the boat slowed or stopped, so did the influx of water. Many of these other owners actually observed that the water was entering through the aft air vents. (See, e.g., Raub deposition at 22; Heuman deposition at 22; Premo deposition at 24; Seidell deposition at 19.) Second, the various experiences illustrate that the water tended to build up in the stern of the boat, and that as it did so, it affected the boat's speed and/or maneuverability in a way that was perceptible to the driver. The point at which the water became noticeable, however, varied a great deal, apparently according to the rate of intake and the individual habits and perception of the person driving. Finally, and most significantly, the variety of circumstances present in the deposition accounts illustrates clearly that the rate of water intake, as well as the presence of any water intake to begin with, is a characteristic of the individual boat involved.

E. Former owners of the Sea Mar

29. The Court therefore found the accounts of former owners of the Sea Mar itself to be the most probative evidence on the subject of the water intake problem. Plaintiffs introduced the depositions of all former owners of this boat. Robert Olsz-

19. This is consistent with the language con-    tained in Trojan's recall notice.

ewski, the first owner of the Sea Mar, stated that he never experienced water intake on the boat. He owned the boat for approximately one year, and during that time he crossed Lake Michigan in it two times. (Olszewski deposition at 22–23.) He was quite confident in his assertion that no water was taken on, stating that he checked the bilge frequently while underway and at the conclusion of his trips. (*Id.* at 31–32.) The second owner of the Sea Mar, however, had a markedly different experience. Donald Lazar related that he first noticed water intake on an extended trip, covering two and a half hours, from Michigan City, Indiana to Chicago. (Lazar deposition at 15.) He recalled that that was his first lengthy trip in the boat.[20] Lazar stated that the water accumulation had the effect of making the boat feel "heavier and sluggish." (*Id.* at 16.) Because of the water intake, Lazar installed a rear bilge pump in the boat before his second year of operating the boat. (*Id.*)

The third owner of the boat, Jack Zimmerman, used the boat seldom and did not remember any specific instances of water intake. (Zimmerman deposition at 14.) He did not recall whether there were two bilge pumps in the boat or only one, but he did state that he did not remove any bilge pump from the boat, and that he did not know of anyone doing so during the time that he owned the boat. (*Id.* at 16.) The last owner Claude Boles, testified on deposition that the boat had only one bilge pump, in the forward portion of the boat, during the entire time that he owned it. (Boles deposition at 24.) He stated that he did experience instances of water intake when he took the boat out on extended cruises. (*Id.* at 57.) According to what Boles related, the water built up to the point where he could see it if he opened the rear hatch to switch fuel tanks, and it was sufficient in amount to cause him to stop the boat periodically in order to let the water be pumped out. (*Id.* at 57–58.) He felt that the presence of the water hampered the efficiency of the boat and caused it to slow down. (*Id.* at 58). Boles had no very clear memory of whether he discussed the phenomenon, or his practice of periodically stopping the boat, with the decedents. (*Id.* at 60–61.) However, Boles stated elsewhere in the deposition that he told the decedents "nothing specific" in terms of particular problems or "idiosyncrasies" that the boat possessed. (*Id.* at 82.) In light of this, the Court finds it most probable that Boles said nothing to the decedents about the water intake he experienced on long trips, or about his method of handling it.

The testimony of Lazar and of Boles is most persuasive that this boat did have a severe, repetitive water intake problem. Lazar and Boles owned the boat the longest, traveled with it the most often, and were subjected to all of the dangers and defects that had been reported by defendant Whittaker in its recall notice. Boles related his harrowing experiences as though they almost were a matter of course, stating that he would observe an accumulation of water upon ordinary operation of the boat, that he would stop the boat allowing it to resume its position and that the one and only bilge pump then would remove the accumulated water. (Boles deposition at 57.) So acute and persistent was the problem that Boles purchased a second bilge pump for the express purpose of installation in the boat's stern. (*Id.* at 60.) Neither Lazar nor Boles ever observed the exact source of the problem, but neither of them seriously investigated the situation. (Lazar deposition at 78; Boles deposition at 58.) Their descriptions of the way in which water was taken on, however, coincide with the descriptions of the other owners, all of whom said that water accumulated in the stern, and ceased to accumulate if the boat was no longer moving. In light of this, the Court has no hesitation in concluding that the water in-

---

**20.** He stated further that at various other times, when he was coming into a harbor or slowing down, he had seen water surge forward over the carpeting in the front cabin of the boat. He attributed this to a redistribution of water that had accumulated in the rear of the boat, and that was caused to flow forward when the boat came down from a planing configuration. (Lazar deposition at 16–17.)

take experienced by the owners of the Sea Mar was in fact due to the same splashing through the aft air vents that had been reported by the other F–32 owners, and that was described in the Trojan recall notice.

Lazar and Boles each stated that the phenomenon occurred during cruises over an extended period of time. Lazar opined that the condition according to his experience was not a result of the height or direction of the seas, but rather of continued operation of the boat being driven on plane, with the hull lifted up and the boat never stopping or settling down, over a sustained period of time. (Lazar deposition at 81–81.) Boles did not state the exact sea conditions that gave rise to his experience, but confirmed that the phenomenon occurred when he was cruising uninterruptedly over time. (Boles deposition at 57.) The continuous driving in a planing attitude therefore appears to the Court to be the crucial component of water intake for this particular vessel.

### F. Circumstantial evidence of causation

30. Both plaintiffs and defendants presented expert testimony intended to instruct the Court concerning certain physical properties of the Sea Mar, such as its structural integrity and its stability.

Plaintiffs presented the expert testimony of Commander John Deck, who characterized himself as a "marine consultant" and naval architect, and Lt. Col. Robert Ricard, also a "marine consultant." [21] Deck's testimony in large part related the results of an inclining experiment that he conducted on a Trojan F–32 called the "Mucky Duck." The "Mucky Duck" was a 1975 model boat, manufactured in 1974, which was moored at Saugatuck, Michigan when the experiment was performed. The objective of the experiment was to test the effect that a large collection of water in the bilge of this boat would have on the boat's inherent stability.

Deck related that he began his experiment by stripping the "Mucky Duck" down to what he called a "light ship condition." This condition allowed Deck to perform tests on the basic stability of the vessel, which he did by placing weights on the vessel and measuring its degree of heel. Deck then restored the vessel to a "pre-casualty condition" by taking the stripped-down ship and adding to it the additional weight due to the two extra fuel tanks,[22] the furniture and miscellaneous items listed in Boles' inventory, and the four crew members. The vessel then was flooded with enough water to bring it to what Deck termed "flood stage I." This stage represented the amount of water necessary, assuming a 2 degree angle of plane, to reach the spark plugs in the engine compartment. According to Deck, this turned out to be 450 gallons of water (approximately 1.5 tons). When "flood stage I" was attained, Deck calculated a variable known as the righting arm. This variable, according to Deck's testimony, bears a direct relationship to a vessel's seaworthiness or, more specifically, its ability to withstand waves hitting it on the beam, and to avoid capsizing.[23]

---

**21.** Both Deck and Ricard are retired from the coast guard. Deck had attended the Coast Guard Academy, and also had obtained degrees in naval engineering and mechanical engineering from the Massachusetts Institute of Technology. During his time with the coast guard, he worked in areas involving development of various types of marine transportation; since then, he has had a private consulting practice that he stated involves casualty investigation and what he called "risk analysis." Ricard also was involved in boating safety during his tenure with the coast guard. He presently works as a consultant and "marine surveyor," and also is involved in casualty investigation. The Court finds both of these witnesses competent as experts in the fields that they identified, under Fed.R.Evid. 702.

The Court was greatly impressed with John Deck, due to his superior qualifications, his thoroughness, and his manner of presentation on the stand. The testimony of Mr. Ricard, with reference to the esteem conferred upon Commander Deck by the Coast Guard, was particularly revealing.

**22.** The F–32 models of which the Sea Mar was one came standard with two fuel tanks; the Sea Mar had been fitted with extra tanks at a later time.

**23.** Deck provided the Court with a discourse concerning the physical factors that determine

In the next part of the experiment, Deck added an additional 450 gallons of water to the boat ("flood stage II") and again measured its righting arm. As a result of the data obtained through the experiment, as well as through his general expertise in the area, Deck testified that he reached several conclusions. First, he concluded that in an unflooded condition, the F–32 was stable and "seaworthy" and could withstand at least up to 12–foot seas. Second, Deck stated that in his opinion, the 450 gallons taken on in "flood stage I" would be sufficient to disable the boat's engines.[24] Deck hypothesized that at that point, the boat would be dead in the water and soon would be knocked beam to the seas by the strength of the waves.[25] The 450 gallons of water would, in Deck's estimation, cause the draft of the stern of the boat to increase, thereby decreasing the amount of freeboard available below the aft air vents.[26] Deck assumed that in this condition, the boat, without power, would be rolling freely in the waves and would continue to take on water. Finally, Deck concluded that at some point between "flood stage I" and "flood stage II," the boat would have taken on sufficient quantities of water that its stability would be so im-

paired that it would be readily susceptible to capsizing in six-foot seas.[27]

Deck expressed a few other opinions about the Sea Mar, based upon his general background and expertise. Most notably, he opined that the presence of a rear bilge pump in the F–32, although it might have stemmed the buildup of water, would not "cure" the defect inherent in the air vent design. He also opined that the gradual intake of water, in the way experienced by the other boat owners, would be less noticeable if the boat were driven on plane than in a displacement mode, particularly as the water built up. He stated that the added weight due to water taken on certainly would increase the boat's fuel consumption as it traveled at a constant speed.

The opinions of Deck were largely confirmed by the plaintiffs' other expert, Lt. Col. Ricard. Ricard concluded that the Sea Mar was "unseaworthy" due to the air vent defect. He also concluded that the presence of an aft bilge pump would not have removed the inherent defect, his opinion being that a boat ought to be designed to "keep water out." Ricard testified that, based upon his training and experience in the area of ship building, the Trojan F–32 is a boat of "good structural integrity,"

whether a boat is stable. From this the Court learned that, in very general terms, a boat's ability to right itself, i.e. to recover from the strong tilt that results when the boat encounters a wave, contributes to the boat's stability. This characteristic is affected by the boat's center of gravity, which in turn is associated with the way in which the boat's weight is distributed. Water in a boat's bilge that is able to run the length and width of the boat has a marked effect on the boat's center of gravity; the effect is directly proportional to the amount of water collected.

24. This conclusion, of course, was based upon his knowledge of the engine compartment on the "Mucky Duck." The defendants have disputed the assumption that the Sea Mar's engine compartment was arranged in an identical way.

25. All of Deck's hypotheses concerning how an F–32, in particular the Sea Mar, would react to the various flood stages in a dynamic situation were based upon the weather and wave conditions that had been testified to by plaintiff's expert, Conrad Gosset.

26. "Draft" refers to the distance between the water line and the bottom of the boat's hull. "Freeboard" measures the distance between the

waterline and the point on the vessel where water may enter unimpeded.

27. Deck explained the situation thus: as the boat's righting arm increases, due to the great shifts in the boat's center of gravity that result from the presence of water in the bilge, so does a variable known as the "roll period." The roll period roughly measures the time necessary for the boat to heel over and recover itself. According to Deck, this roll period also increases as more water is taken on the boat. When the roll period reaches a value that is approximately equal to the "wave period," or the time elapsing between the crests of successive waves, a phenomenon known as "resonance" occurs. Resonance can create synchronous rolling, under which the vessel will heel over to a greater extent than it normally would under similar waves; this may cause the boat to heel over to the point that it cannot recover itself, resulting in capsizing. Deck opined that, under the weather conditions put forth by Gosset, this phenomenon would occur at some point between flood stages I and II.

subject, of course, to the stability problems outlined by Deck in connection with the water intake situation.

Ricard also provided the Court with several observations and conclusions about nighttime navigation. He noted that at night, it is more difficult to notice differences in speed and in attitude, because the visual frames of reference (e.g., the horizon) are not available. He did state that in general, water intake would be more readily noticeable when traveling on plane than when in the displacement mode, because of the change in the boat's trim. He opined that by the time the Sea Mar hit six-foot seas, however, it was traveling in a displacement mode rather than on plane.

Defendants presented the testimony of James Wynne and Peter Ball.[28] Wynne testified that in his opinion, three or four thousand pounds of water in the bilge of an F–32 would be immediately apparent to the driver of the boat, particularly in a planing attitude. He stated further than the water collection undoubtedly would be perceptible at some point before three thousand pounds had been taken on.

Wynne stated that he had no criticism of the mechanics of Deck's inclining experiment; however, he opined that such a static experiment bears little relationship to the way a boat would behave in a dynamic situation, such as the open lake. He stated that in his opinion, it would be very difficult to predict the effect that water intake would have on the boat's center of gravity. Wynne specifically stated that he felt that in seas of the types hindcast by defendants' expert, this boat would have been susceptible to broaching and capsizing.

Ball's testimony was concerned in large part with his opinion concerning the capacity of the fuel tanks on board the Sea Mar. He stated that according to his belief and information, the two extra fuel tanks on the boat only had a capacity of 50 gallons each. With the two standard tanks at a 60 gallon per tank capacity, the total fuel capacity of the boat was only 220 gallons, and not 250 gallons as Boles had stated in his deposition. Ball concluded that, following from this error in Boles' basic assumption as to the fuel tank capacity, Boles' estimate also must have been off. He opined that in fact, there were only about 130 gallons of fuel on board when decedents took off; Ball stated that with this amount of fuel, the tanks would have been sufficiently low by the time decedents neared the end of their crossing that sloshing fuel could have caused the engines to sputter or stop. Ball further stated that the additional weight added by water intake, if any was experienced, would certainly increase the boat's fuel consumption.

The Court reaches several conclusions based upon the expert testimony summarized above. First, the Court finds that this boat in fact was stable and seaworthy, leaving aside for the moment the air vent problem, and that in an unflooded condition it could be safely navigated in seas of the sort that the Court found existed in the eastern part of Lake Michigan on the relevant date. Second, the Court accepts the testimony of Deck, which was confirmed by Ricard and defendant's expert, Wynne, that from the point of boat design, the boat, with the aft air vents as designed by Trojan, still would have been dangerously defective even with the presence of a stern bilge pump. Third, the Court accepts the experts' conclusions that the presence of water in the boat's bilge would increase the vessel's fuel consumption. Finally, the Court is convinced by the testimony of Deck that water intake, of the type described by the former owners of this boat, had an adverse affect on the Sea Mar's inherent stability, and it finds further that the danger caused by this situation was greatly accentuated in heavy seas.

31. Based upon the facts already found, the Court is compelled to conclude that the

---

28. Wynne is a boat designer, who presently also engages in marine consulting. He earned a master's degree in mechanical engineering at the Massachusetts Institute of Technology, and testified to his experience in boat racing. Ball was trained in marine engineering and naval architecture at the University of Michigan; his professional history included employment at Chris Craft, where he was involved in engineering and design testing. Both of these witnesses are considered by the Court to be competent to testify as experts under Fed.R.Evid. 702.

Sea Mar, during its last attempted crossing of Lake Michigan, did in fact take on water in substantial quantity. This conclusion is, of course, immediately apparent based upon the testimony of Lazar and Boles concerning their prior experiences with water intake. (*See* Boles deposition at 57.) The conditions that favored water intake, according to the accounts, certainly were present during this last excursion: Anderson and his crew left Chicago at high speed, with the boat on plane, on a trip that was expected to last several hours. Decedents had given no indication that they expected to stop at any point along the way, in fact, all indications were to the contrary; this would have allowed the water to build up continuously and in large quantity.[29] Finally, and very significantly, decedents were unaware of the possibility of water intake through the air vents, and they certainly were unaware of the advisability of stopping the boat periodically in the manner described by Boles.

The defendants' experts all opined that it was "unlikely" that water was taken on in this situation, because of certain assumptions made concerning the boat's course.[30] The experts assumed that water was not taken on during this voyage because decedents had chosen a course that took them beam to the seas for the entire journey. The Court finds this assumption to be untenable. Both common sense and the evidence [31] show that this is not a course that would have been followed by good, experienced seamen such as Anderson and his crew. Even though decedents most probably were roughly following the rhumb line between Chicago and Holland, they undoubtedly adjusted their course periodically (by "tacking") to keep the seas quartering on either the stern or the bow. According to the facts already found, such a course to the seas would allow water to be taken on this boat over a sustained period of time.

Defendants, through their experts, also have opined that these decedents undoubtedly would have noticed even gradual water accumulation. They stressed the fact that there was no apparent signal or radio call for help at a relatively early stage, which is when Wynne opined the water would have been noticed; this is taken as an indication that such water accumulation did not occur. The Court cannot accept this interpretation of the facts, however. The Court notes that visibility is greatly reduced at night and that, as pointed out by Ricard, this would make it much more difficult for the decedents to have noticed slight changes in the boat's speed or attitude that might only have been apparent by reference to stationary landmarks. This phenomenon quite possibly prevented early detection of the water buildup. However, the Court does find that in light of the length of the voyage and amount of water undoubtedly taken on, as well as in light of the fact that decedents at some point had to lift the rear hatch in order to switch fuel tanks, the crew more probably than not *did* notice the water at some point. Even so, the Court does not find that the absence of a distress signal is as inconceivable as the defendants' experts maintained. The Court finds that all of the evidence in the case points to the conclusion that the decedents at some point during the voyage decided to make a "run for

29. Neither Boles nor Lazar was specific about the amounts of water that had accumulated in the boat. Boles stated, however, that it was enough so that he could feel the boat slowing down, and that it was enough to force him to stop so that the water could drain out. Lazar also noticed the effects of the water on the boat's handling, and he remarked, as noted *supra* footnote 20, that at times the quantity of water collected was enough to surge over the carpet in the lower cabin as the boat came off plane.

30. The Court notes that the foundation for all of the experts' opinions, concerning the predicate circumstances for water intake, are based upon the experts' readings of the other owners' depositions presented in evidence here. The Court does not consider, however, that the expertise of these witnesses enables them more readily to extract information from these depositions than the Court itself is able to do. The Court's conclusions as to the facts shown by this evidence already have been set out, *supra*.

31. Boles testified that he always preferred to ride in quartering seas, with beam seas being the kind he most wanted to avoid in that boat (Boles deposition at 66–67).

it." The decedents undoubtedly were on notice, before very long into their trip, of the approach of bad weather. They knew that they had started out with fuel tanks that were at the most only half full. In addition, the Court already has concluded that, although the Sea Mar started out going more or less straight across to Holland, at a point late in the voyage they departed from this route and headed more directly toward shore. All of this confirms the Court's conclusion that, by the time decedents were made aware of the water accumulation, their overriding objective was to reach shore as quickly as possible.

32. The experts on both sides presented their opinions as to the ultimate cause of the sinking of the Sea Mar. Briefly summarized, plaintiffs' experts opined that the most likely cause for the occurrence was the uncontrolled influx of water through the aft air vents, as a direct result of the design defect.[32] Defendants' experts stated that in their estimations, the vent defect was most unlikely as a possible cause of the sinking. Each of them offered alternative explanations thought to be more likely: Wynne hypothesized that the boat foundered and/or broke up in seas that were too great for it to handle; Ball expressed the opinion that the boat probably ran out of gas.

The Court has of course weighed and evaluated the various possibilities that have been suggested to it. It finds, upon a careful assessment of all the evidence presented in the case, that the most probable cause of the Sea Mar's sinking and the plaintiffs' injuries was the air vent defect. In reaching this conclusion, Court does not rely upon the opinions given by any expert on the ultimate issue of causation. Rather, the Court finds that the physical evidence, the experiences of former Sea Mar owners, and the uncontroverted evidence concerning the boat's stability characteristics yield one reasonable conclusion.

The Court notes that the parties have mentioned several possible causes of the boat's disappearance that can only be dismissed as utterly remote. Among the most remote are disappearance due to piracy or terrorism, suicide on the part of the decedents, or surreptitious flight. The possibilities of fire or explosion also may be dismissed because the existing debris from the boat shows no signs of exposure to heat or flame. Other possibilities such as collision with another boat or with a submerged object, failure of the hull, or a random lightning bolt, are not as remote as some of the possibilities mentioned above; however, they are sufficiently unlikely that none of the experts in the case ever referred to them as "probabilities," but merely as "possibilities."

The Court is aware that random mechanical failures in boat engines are not uncommon occurrences. An engine is, of course, susceptible to the weaknesses of its many crucial components. However, two factors make this possibility, in the Court's estimation, unlikely to be the sole reason for the boat's ultimate disappearance. First, the Court notes that this boat was equipped with two engines, one of which had been recently serviced. No expert in the case addressed the probability of both engines experiencing mechanical failure roughly simultaneously; the Court is satisfied by the application of common sense that this circumstance would be rare. Further, the Court has accepted as most credible the conclusion of expert Deck, based in part on his inclining experiment, that the Sea Mar was sufficiently stable in an unflooded condition to withstand the buffeting caused by even up to twelve-foot seas. The Court observes that the most recent owner of the Sea Mar, although a very cautious boater by his own admission, had run the boat without incident in six-foot seas. (Boles deposition at 50, 56, 65.) It also gives particular weight to the uncontroverted evi-

---

**32.** Deck attempted to express his opinions as to cause in terms of actual statistical "probabilities." He informed the Court that his conclusions were not reached, however, as a result of any independent statistical analysis of risk based upon empirical data. He stated that the statistics were based merely upon his own experience. The Court does not find these probabilities credible, insofar as they purport to be actual, numerical predictions of the relative probabilities of different events, and it does not rely on them as such.

dence that in decedent Anderson, the Sea Mar had an experienced captain who, after many "search and rescue" calls, knew how to navigate in very rough seas. In light of this, the Court cannot find it probable that even if mechanical failures had disabled the Sea Mar's engines, the boat would have been submerged or capsized before decedents either could have remedied the situation or sent a call for help.

The possibility that was stressed as a probability by defendants' expert Ball was that of running out of gas. The Court acknowledged that it is possible that Boles' estimate of the amount of fuel on board was high; that possibility, of course, is enhanced by Ball's testimony that all of Boles' estimates were off because he had mistaken the true capacity of the fuel tanks. However, the Court finds that even if the Sea Mar had had on board as little as 120 gallons of fuel at its departure, this would have been sufficient to make the straight crossing to Holland, with a safe margin to allow for some maneuvering, unless independent circumstances had caused fuel consumption to increase. Two possible causes for increased consumption are heavy seas and extra weight. The facts found so far show that the decedents did not encounter severe weather until relatively late in their cruise; however, they also show that the boat was carrying water in the bilge for most of the ride, in an ever-increasing quantity. Therefore, the Court must conclude that if the boat did in fact exhaust its fuel supply, it was the result at least in part of the water accumulation in the bilge.[33]

Defendants' expert Wynne testified that in his opinion, the most likely reason for the Sea Mar's disappearance was the conclusion that the boat had been "overpowered" by seas that it could not handle. This explanation, however, also is not credible to the Court. This is so in part because

of the Court's conclusions with respect to the boat's inherent stability and the experience of its crew. The Court finds it unlikely that, in an unflooded condition, the Sea Mar would have heeled over and capsized in the types of seas hindcast by Meadows. Wynne discussed the possibility that an unusually large wave, of that type that Meadows predicted would occur once in a long while even in six-foot seas, could have crashed into the boat or broken over it, breaking off or smashing the top of the boat. This explanation, however, is not consistent with the debris that surfaced after the accident. Wynne could not explain why, if indeed the top of the boat had been ripped off by an extraordinarily forceful wave, more items from inside the cabin area have not been found. The decedents' bodies, for example, never have surfaced; this indicates that the bodies, along with most of the other items in the cabins, were trapped in the boat as it went down.[34] This clearly is not consistent with a theory that the boat was suddenly burst open by a wave.

The Court finds that, in light of all of the evidence in the case, the most probable cause of the boat's disappearance was capsizing and sinking due to the water taken on the boat. This theory is consistent with the facts already found by the Court, and it is supported by credible expert testimony. As already stated, the Court finds that this boat inevitably took on water as it cruised across the lake; it also finds that water intake adversely affected the boat's stability. The debris from the boat includes both of the large hatch covers from the floor of the main cabin. The fact that these bulky items from inside the boat were found floating shows that they must have been removed while the boat still was afloat; this means that decedents must have sought access to the entire engine compartment. The lack of much more debris from inside the cabin, however, indicates strong-

---

**33.** Ball also put advanced the theory that if fuel levels in the gas tanks were sufficiently low, the engines could falter. This, of course, could cause loss of maneuverability; however, for the reasons pertaining to the boat's inherent stability, set forth above, this would not necessarily cause foundering or capsizing.

**34.** There was expert testimony to the effect that in Lake Michigan, unlike Lake Superior, the bodies of drowning victims usually will surface after some time.

ly that the boat capsized and that the men and equipment were trapped beneath the hull. The theory that is most consistent with all of these facts is that at some point, both engines did become disabled, probably due to the presence of the water itself or due to a water related problem, such as fuel exhaustion. At the point that the engines died, there already was enough water in the boat's bilge to cause the boat to roll at steep angles in the seas. With the boat rolling in the heavy waves, water inevitably would wash up the sides of the boat and through the vents; this phenomenon would be accentuated by the fact that the increased draft in the stern had lowered the freeboard on the aft end of the boat. This would result in the accumulation of enough water to impair the boat's stability to the point where it would be susceptible to capsizing.

None of defendants' experts made specific objections to Deck's experiments on the "Mucky Duck," nor did any of them refute Deck's general conclusion that water would affect the boat's stability.[35] Defendants did object to Deck's scenario for the disaster, primarily on the basis that it involved certain "assumptions" about what happened to the boat at the crucial point after the engines had failed and before capsizing. Defendants assert that during that time, the water collected could have been expelled, perhaps by the pump in the forward bilge. The Court finds, however, that the crucial factor in Deck's scenario, one that is supported by the physical evidence, is the fact that, due to the combination of heavy seas and water accumulation, decedents already were in an irreversibly disastrous situation by the time the engines went out. The water that had built up continuously over the past four hours of steady cruising would have been added to by water from the waves hitting the side of the boat; this was a phenomenon that decedents obviously would not have been able to control. Under these circumstances, the Court finds it very unlikely that even the front bilge pump, if it was still working at the time, could not have counteracted the problem faster than water was being taken on.[36]

## Conclusions of Law

### A. Products liability claims

At the outset, this Court is faced with a question concerning whether jurisdiction over this action, and thus the source of the applicable law, lies in federal admiralty law, or in the common law of Michigan due to diversity. Plaintiffs have invoked both admiralty and diversity jurisdiction over the action pleaded in the complaint; the defendant's third-party complaint specifically called upon the Court's admiralty jurisdiction insofar as it was based upon Fed. R.Civ.P. 14(c). The Court has never expressly found that jurisdiction lies exclusively under either admiralty or diversity of citizenship.[37]

▮ The Court concludes that at least with respect to the claims pleaded in plaintiffs' principal complaint, the exact source

35. Wynne did opine that it is "difficult" to calculate the effect that water has on a boat's roll moment. He did not, however, make specific objections to Deck's methodology or conclusions. The Court therefore rejects his general statements in favor of Deck's more specific analysis.

36. Boles stated that he was not sure of the capacity of the bilge pump on the Sea Mar. He did state, however, that he had replaced the forward pump at one time with the same model pump that already had been in place there (Boles deposition at 24). This pump had not been replaced by any other owner of the boat; according to Olszewski, the boat's first owner, it was the original pump supplied by Trojan (Olszewski deposition at 16). It may be assumed that this was the same model and capacity pump supplied by Trojan in other F-32's of the same year; according to Raub, an owner of another F-32, 1974 model, stated that his forward pump had been rated at a capacity of 800 gallons per hour (Raub deposition at 20). Based upon this, the Court may assume that it would have taken over half an hour for the pump to remove at least 450 gallons of water, which, according to the Deck scenario, would have been enough water to deaden the engines. Meanwhile, waves were hitting the boat constantly, every 2–3 seconds according to Meadows' data.

37. The issue was raised by way of defendants' motion to strike plaintiffs' jury demand, but it never was resolved because the parties settled that motion by stipulation.

of its jurisdiction makes no practical difference. Federal jurisdiction clearly will lie in any event, based either upon admiralty or upon the fact that the parties are diverse in citizenship. In addition, the causes of action pleaded by plaintiffs against the principal defendant are cognizable in admiralty, as products liability claims have been allowed to proceed in maritime actions. *See, e.g., Schaeffer v. Michigan–Ohio Navigation Co.,* 416 F.2d 217, 221 (6th Cir.1969), *In re Marine Sulphur Queen,* 460 F.2d 89, 101 (2d Cir.1972). Maritime products liability actions are governed by principles of general law, which often are informed by more specific principles of state law. *Marine Sulphur Queen,* 460 F.2d at 101; *see also Columbia Brick Works, Inc. v. Royal Insurance Co.,* 768 F.2d 1066, 1071 (9th Cir.1985) (state law used to construe maritime insurance policies). Plaintiffs therefore enjoy essentially the same cause of action, whether it is characterized as a claim at admiralty or a claim at law.[38]

Plaintiffs have pleaded five distinct grounds for recovery against Whittaker based upon the alleged defects in its product. They have asserted liability because of negligence; gross negligence; breach of implied warranty; breach of express warranty; and strict liability. Michigan law recognizes two theories of recovery for products liability; negligence, and breach of implied warranty.[39] *Toth v. Yoder Co.,* 749 F.2d 1190, 1193 (6th Cir.1984). Under a negligence theory, a manufacturer will be liable if he breaches a duty of care owed to a consumer, where the breach proximately causes damages. *Rhea v. Massey–Ferguson, Inc.,* 767 F.2d 266, 269 (6th Cir.1985). Recovery under a breach of implied warranty theory rests upon a finding that the product in question contained a defect that proximately caused plaintiff's injuries. *Id.*

The plaintiffs in this case assert that the manufacturer of the Sea Mar was negligent in several particulars. They claim that the boat had been defectively designed; specifically, they claim that the fact that the boat was prone to collect water in large quantities while underway made the product unreasonably dangerous, and "unseaworthy."[40] A manufacturer operates under a duty to design its products in such a way as to prevent any unreasonable risk of foreseeable injury. *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 365 N.W.2d 176, 186 (1984). This definition of the manufacturer's duty under a negligence theory closely dovetails the definition of "defect" under implied warranty theory. For purposes of the latter, a product is defective if it is not "reasonably safe for the uses intended, anticipated, or reasonably foreseeable." *Id.* In light of this close relationship, it has been held that a finding that a product is defective necessarily implies a finding that the manufacturer breached its duty with respect to product design. *See id.,* 365 N.W.2d at 186–87.

Defendant Whittaker has conceded in this case that certain of the Trojan F–

---

**38.** The Court therefore will assume, without expressly finding, that the subject matter of this action has a sufficient nexus to "traditional maritime activity" to justify the application of maritime law. *See Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).

**39.** In this respect, it may be said that Michigan law differs from general law on the subject, in that Michigan law fails to recognize a distinct theory of strict liability for products. *See Stephens v. G.D. Searle & Co.,* 602 F.Supp. 379, 382 (E.D.Mich.1985). However, the elements of an implied warranty action are substantially the same as those of an action based upon strict liability. *See Johnson v. Chrysler Corp.,* 74 Mich.App. 532, 254 N.W.2d 569, 571 (1977) (proofs on implied warranty theory held to overlap with proofs on strict liability). In any

event, the Court finds that in light of the facts as they have been found on this record, the outcome of the case will be the same, whether an implied warranty theory or a strict liability theory is relied upon.

**40.** Plaintiffs referred several times in their complaint to the fact that the boat as manufactured was "unseaworthy." They also presented evidence at trial, through their experts, of the boat's unseaworthiness. The Court finds that to the extent that plaintiffs in so doing were attempting to plead a separate basis of liability based upon unseaworthiness, this use of the notion of unseaworthiness is not appropriate as against the boat's manufacturer. *See Marine Sulphur Queen,* 460 F.2d at 101 (citing *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 89, 66 S.Ct. 872, 874, 90 L.Ed. 1099 (1946)).

32's that it had designed, including the Sea Mar, contained what amounted to a "defect." As stated in the recall notice, the design of the boats' aft air vents allowed water under certain conditions to accumulate in the bilge in sufficient quantities "to disable the engines and eventually to swamp the boat." (Plaintiffs' exhibit 271.) This fact leads the Court to the inevitable conclusion that the boats with this particular design held an unreasonable risk of serious injury, specifically swamping and sinking, as a result of normal and foreseeable operation. The Sea Mar therefore clearly was "defective" in the legal sense, and had not been designed in accordance with the manufacturer's duty.

■ Under both the negligence and the implied warranty theories, the next question in the determination of liability focuses on the proximate cause of plaintiffs' injuries. This is the factual dispute that became the principle issue at trial. In order to be considered a legal cause, a particular occurrence or circumstance must be a "substantial factor" in bringing about the harm suffered. *Toth v. Yoder Co.*, 749 F.2d 1190, 1196 (6th Cir.1984). "Proximate cause" has been defined as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." *Taylor v. Wyeth Laboratories, Inc.*, 139 Mich.App. 389, 362 N.W.2d 293, 297 (1984). With respect to the manufacturer, plaintiffs clearly bear the burden of proving proximate causation by a preponderance of the evidence, under either a negligence or a breach of implied warranty theory. *See Marine Sulphur Queen*, 460 F.2d at 101.

The Court in this case already has found that plaintiffs' decedents died as the result of the sinking of the Sea Mar on September 25, 1980; this obviously forms the substance of plaintiffs' injuries. The Court further has found that the boat undoubtedly took on water through the aft air vents,

and that the sinking more probably than not was the result of the effect of the water on the boat. The evidence in the case has led the Court to find that it is more likely than not that, without the accumulation of water in the boat's bilge, the sinking would not have occurred. The defect in the boat therefore was a "substantial factor," and a necessary factor, in the demise of the Sea Mar and its crew.

Defendant Whittaker has suggested to the Court that the facts in the case show that certain acts on the part of others worked as independent, "superseding" causes sufficient to break the sequence between defendant's action and the injury. Specifically, defendant has identified certain particulars of the conduct of third-party defendant Boles, the owner of the Sea Mar, that it states constituted superseding causes of the accident. Whittaker alleges, for example, that Boles negligently removed the stern bilge pump that had been installed by prior Sea Mar owner Lazar. The Court does not consider that Boles's acts, however, were sufficiently independent and unforeseeable, with respect to the acts of the principal defendant, to sever the causal relationship between the manufacturer and the injury.

The defendant asserted throughout the trial in this case that prior to the time that Boles owned the Sea Mar, a second bilge pump had been installed in the boat. It further urges the Court to conclude that Boles removed the rear bilge pump during the time that he owned the boat. The Court has found that the second owner of the Sea Mar installed a bilge pump in the stern of the boat. The Court, however, found no evidence on the record to support the conclusion that Boles removed the pump, and it in fact found that when Boles took possession of the Sea Mar, the boat had one bilge pump as Boles testified. The actions of Boles in this regard, therefore, cannot have been a cause of any loss suffered by plaintiffs.[41]

---

**41.** The Court also finds it particularly revealing that plaintiffs' expert Ricard stated emphatically on cross-examination that the addition of a stern bilge pump did not in any sense "cure" the

essential defect in the boat. He stated that a boat under all circumstances ought to be designed to keep water out, as that is the "first line of defense." In Ricard's opinion, installation of

Moreover, Boles' failure to install a rear bilge pump cannot be held to have been a superseding cause of plaintiffs' injuries, even in light of the fact that the manufacturer conducted a recall and retrofit campaign. A manufacturer cannot automatically insulate itself from liability by sending out notifications of possible defects, particularly where the notice does not reach the ultimate consumer of the product. *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1323 (7th Cir. 1983); *Pan–Alaska Fisheries, Inc. v. Marine Construction & Design*, 565 F.2d 1129, 1137 (9th Cir.1977). In any event, it will be a question of fact in any given case whether a consumer's failure to protect against a defect in a product was unforeseeable in light of the manufacturer's notice. In this case, the manufacturer notified only dealers, first owners of the F–32s' under recall, and such subsequent owners as were known to it. The record is clear, however, that none of the owners of the Sea Mar ever was notified of the air vent/water intake problem. The second owner, Lazar, testified that he had installed an additional pump because of his personal experience with the boat and not at the manufacturer's suggestion. Boles stated that he had never heard about the recall. In light of the scope of the defendant's recall attempt, Boles failure as a fourth owner of the boat to install a second bilge clearly must have been foreseeable to the manufacturer. In light of the fact that Boles never in fact received the recall notice, his actions in this regard were not independent of those of the manufacturer. Boles' inaction with respect to the pump therefore was not a superseding cause of plaintiffs' injuries.

## B. Claims against the Sea Mar's owner

Defendant Whittaker has claimed, in its third-party complaint in admiralty under Fed.R.Civ.P. 14(c), that third-party defendant Boles is liable to plaintiffs on several theories. Rule 14(c) allows a defendant to assert theories of liability against third-party defendants on a plaintiff's behalf. An action then may proceed as though plaintiff had pleaded those theories against third-party defendants originally. In this case, plaintiffs at trial affirmed and expressly relied upon their rights to proceed against third-party defendant Boles on the bases pleaded by defendant.

Whittaker has asserted that Boles is liable on a theory of negligence, based upon various acts and omissions with respect to the boat, and on the theory that Boles, as owner of the boat, is strictly liable for the fact that the boat was unseaworthy. Boles has denied the allegations of negligence on his part, and asserts that the facts do not support the imposition of strict liability upon him in the event that the boat is determined to have been unseaworthy.[42]

The theory of strict liability based upon unseaworthiness was pressed most strenuously by principal defendants at the time of trial. Under traditional principles of admiralty law, the owner of a vessel owes an absolute duty to a certain class of individuals to provide a "seaworthy" boat. *Reed v. The Yaka*, 373 U.S. 410, 414, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963). This so-called warranty of seaworthiness creates a presumption in favor of a plaintiff who can establish unseaworthiness, in that in certain situations it shifts the burden of producing evidence of proximate cause to the owner of the boat. *Marine Sulphur Queen*, 460 F.2d at 100.

This warranty of seaworthiness is available not only to "seamen" in the strict sense, but to an extended class of workers including independent contractors who may have only an impermanent connection with the vessel. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed.

---

a rear pump would represent only a "temporary fix" but not a cure of the problem.

**42.** Boles contended prior to trial that he should not be considered the owner of the boat because at the time of decedents' accident, the boat was the subject of a demise charter under which decedent Anderson's employer was the owner *pro hac vice* of the Sea Mar. This argument was resolved against third-party defendant Boles by order of the Court on Boles' summary judgment motion. (Opinion on motions for summary judgment, September 9, 1986.)

1099 (1946). The justification for this extended liability lies not in any contractual relations between the owner and the worker, but rather in the relative positions of the two parties. The owner generally is considered to be more readily able to correct problems with the boat; the worker, by contrast, usually has much less control over the conditions of the workplace and often is not in a position to insist upon safety reforms. Further, the owner usually has "deeper pockets" than the worker, and is in a position to spread losses due to accidents throughout the shipping community. *See id.* at 93–94, 66 S.Ct. at 877. In accordance with these objectives, the warranty of seaworthiness will not extend to persons not within this broadened class of workers, such as a guest who is aboard a vessel for purposes unrelated to the work of the vessel. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 629, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959).

▆ In the case at hand, the facts on the record lead the Court firmly to conclude that the warranty of seaworthiness would not properly be applied in this case. The facts show that plaintiffs' decedents in this case were not "seamen," in that they did not have any permanent connection with this vessel, nor were they performing work traditionally done by seamen. *See West v. United States*, 361 U.S. 118, 120, 80 S.Ct. 189, 191, 4 L.Ed.2d 161 (1959). By the same token, the four decedents did not occupy the sort of status vis-a-vis the owner that would justify the imposition of absolute liability upon Boles. The record is clear that Anderson and his companions voluntarily undertook to transport this vessel, and that they were not compensated for doing so. Boles stated that he had expected to drive the Sea Mar to Holland himself in order to transfer possession of the boat to the marina; it is clear that this task was not considered to be a part of Anderson's duties as a broker for the boat. Although three of the decedents worked for a marina, the evidence shows that transporting boats to the marina was not a part of the customary duties held by any of them. Boles and the decedents occupied equal positions with respect to the conditions on the boat; with the exception of Boles' duty to warn of specific latent dangers, which will be discussed *infra*, it is clear that before decedents left Chicago in the boat they had ample opportunity to make certain that the boat was safe and outfitted to their satisfaction. In fact, the record shows that the plaintiffs' decedents had more experience with boats than did Boles, who could best be described as a "weekend boater." In light of all of these factors, it would be inappropriate and unjust to hold Boles strictly liable for the boat's seaworthiness.

A conclusion that Boles owed the decedents no absolute duty to provide a seaworthy vessel does not imply, however, that he owned them no duties at all. On the contrary, Boles owed to Anderson and his comrades the duty traditionally imposed upon a boat owner toward those on board the boat with the owner's permission. General principles of admiralty law require that an owner in this situation exercise such care as is reasonable under the circumstances. *Kermarec*, 358 U.S. at 632, 79 S.Ct. at 410. In this case, third-party defendant Boles is alleged to have been negligent in several particulars.

There is a general allegation contained in the third-party complaint to the effect that Boles negligently failed to provide the decedents with a seaworthy vessel. Insofar as this statement is intended to implicate Boles' actions with regard to the stern bilge pump, however, it already has been established that the evidence does not show a breach of duty on the owner's part. Boles cannot be said to have acted "unreasonably" in failing to install a stern bilge pump, particularly in light of the fact that he had never received notice that the boat was considered to be defective in the absence of such an appliance. As found above, the evidence does not show that Boles ever intentionally removed a pump from the rear of the Sea Mar.

▆ The third-party complaint also contains an allegation that Boles failed "to provide for the safe operation and transport of [the Sea Mar]." The Court finds

that the facts on this record show a serious breach of duty by Boles in this regard. Boles, in turning the boat over to decedents at Montrose Harbor, certainly had the greater knowledge concerning latent defects with the boat. Specifically, Boles was at that time aware that the boat tended to take on water in the stern during long voyages. This was a situation that he had developed his own means of coping with, and that would not have been apparent to persons making only a cursory check of the boat when it was stationary. Boles clearly considered the water intake serious enough to cause him to stop his boat completely for several minutes on long trips; the situation spurred him to purchase an extra bilge pump that he had planned to install in the rear of the boat. He knew that the water accumulation had the effect of slowing the boat down in its cruising, and also that the water hampered the boat's efficiency. Boles also knew that there were "tall thunderheads" in the sky; he knew the time of day and the season of the year; he knew that decedents intended to follow a course straight across the open lake; and in particular he knew that the boat was at best only half full of fuel.[43] However, even in light of all of these factors, Boles failed to advise decedents of the water intake he had experienced on similar long cruises on this boat. This omission undeniably constituted a failure to exercise such care as would have been reasonable under the circumstances, and it certainly exposed the decedents to a considerable risk that they had no knowledge of. In this respect, therefore, Boles acted negligently. The Court already has concluded that the water intake more probably than not was causally related to the boat's disappearance. The Court further concludes that if decedents had known of the water intake phenomenon on this particular boat, they would have acted in a way that would have minimized the danger, and that water intake to the point necessary for a capsizing would not have occurred.[44] Therefore, the failure to warn on this point clearly was a proximate cause of the injuries suffered.

The facts shown in the case also raise the possibility that Boles was negligent in failing to turn the Sea Mar over to decedents fully fueled. The Court already has noted Boles' estimate that the boat had 160 gallons of fuel on board when decedents took possession of it; it has found that it is possible and even likely that in fact there was significantly less fuel than that on board at the time. In the Court's estimation, this demonstrates less than reasonable care on Boles' part. However, the Court also has found that, although fuel exhaustion may have occurred while the boat was underway, this was not necessarily a substantial factor in the boat's disappearance. Boles therefore cannot legally be held to account for his actions in this regard.

### C. Claims against the marinas

Third-party plaintiff Whittaker also asserted in its third-party complaint in admiralty that two marinas, Bay Haven Marina and Ottawa Beach Marina, are liable in part for this accident because of their status as the decedents' employers. These allegations are meant to invoke the provisions of the Jones Act, 46 U.S.C.App. § 688.[45] Under this section, a "seaman" who suffers injuries during the course of

---

**43.** The Court finds it likely that it was not merely the sight of the clouds, but the conjunction of many factors including the boat's water intake problem, that led Boles to conclude that he would not have attempted to cross the lake that evening.

**44.** The Court specifically rejects any attempt to attribute negligence to decedents Anderson, Stevenson and Brower on the basis that, as marina employees, they ought to have had notice and therefore independent knowledge of the defect in the Trojan F–32. It already has been found, pursuant to stipulation, that Bay Haven Marina was not an authorized Trojan dealer at the time

of the recall, and that therefore neither the marina nor its employees had prior knowledge of the aft vent defect in those boats.

**45.** Defendant in its third-party complaint does not allege the precise statutory basis for its claims implicating the marinas. However, the facts alleged, including negligence, an employment relationship and actions done in the course of employment, fit at least some of the requirement set out by the Jones Act. Further, the parties in their trial briefs have treated the claims against the marinas as Jones Act claims.

employment may sue his employer, and wrongful death actions on behalf of injured seamen may be maintained. The manufacturer in this case has alleged that the employers are liable because of their negligence, in that they were aware or should have been aware of the defects in the Trojan F–32 that decedents intended to transport. Whittaker also claims that the marinas are liable for injuries that were suffered because of the vessel's unseaworthiness.[46] Although Fed.R.Civ.P. 14(c) allows the defendant to raise bases of liability that would be available to the principal plaintiffs against the third-party defendants, in this case the plaintiffs at trial did not address or prosecute the Jones Act claims asserted against the marinas.

As a threshold consideration, it is clear that only three of the decedents, specifically Anderson, Brower and Stevenson, were employed by a marina at the time of the accident. These three decedents worked in various capacities at Bay Haven Marina. Further, only decedent Anderson was associated with Ottawa Beach Marina. The claims against the marinas therefore must at the outset be scaled down to fit these undisputed facts.

■ The claims made against Ottawa Beach Marina, intended to shift liability on the basis of an alleged employment relationship with decedent Anderson, may be dismissed as unmeritorious without extensive discussion. The facts show that Boles had no dealings with Anderson while Anderson was acting in his capacity as an employee of Ottawa Beach Marina. Boles was not aware that Anderson was associated with that marina. There was no evidence that Ottawa Beach Marina, through Anderson, received any benefit or incurred any obligations in connection with the sale of the Sea Mar; the only benefit to Anderson was the commission he received in his capacity as salesman for Bay Haven

Marina. On these facts, there is no way that Anderson could be held to have been acting in the course of his employment at Ottawa Beach Marina at the time that he took the Sea Mar across Lake Michigan. *See* 46 U.S.C.App. § 688.

■ Insofar as the claims against Bay Haven are concerned, the Court upon the facts in the record also concludes that no case for liability has been made out. Under the Jones Act, a plaintiff must show that he was a "seaman" who was injured in the course of his employment, and that his employer was negligent. *See id.; Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 681 (10th Cir.1981). The case for Jones Act liability in this action fails in almost every respect. As discussed earlier, these decedents clearly were not "seamen," insofar as they were not engaged in the traditional work of the sea but were engaged in what amounted to a pleasure cruise that happened to be incidentally related to the employment of one of them. "Seaman" status under the Jones Act has been defined as a permanent connection with a vessel that is "in navigation," where the duties of the "seaman" contribute to the function of the vessel. *Stansbury v. Sikorski Aircraft*, 681 F.2d 948, 951 (5th Cir.1982). Even the most liberal interpretation of the word "permanent" could not be used to describe the relationship that these decedents and with the Sea Mar, where they were on board the boat on one occasion only, and where no further "assignments" aboard this particular vessel reasonably would have been anticipated. *See Guidry v. Continental Oil Co.*, 640 F.2d 523, 529 (5th Cir.1981) (stating that key to permanence lies in whether there is a "relationship" between a claimant and a specific vessel or group of vessels). The vessel was not "in navigation," in that it clearly was not an instrumentality of either public or private commerce. *See Reynolds v. Ingalls Shipbuilding Div., Litton Systems,*

---

**46.** The claim of liability against the employers, based upon unseaworthiness, although pleaded has not been relied upon by the principal defendant. Third-party defendant Boles, by way of pretrial motion for summary judgment, attempted to revive the issue when he asserted

that Bay Haven was the owner *pro hac vice* of the boat at the time of the accident by virtue of a bareboat charter. As stated, this issue was resolved in favor of the marina prior to trial. Therefore, the only remaining claims against the marina are premised upon negligence.

*Inc.,* 788 F.2d 264, 267 (5th Cir.1986). The three decedents who were employed by the marina were not acting within the scope of their employment at the time of the accident; even Anderson, who was handling the sale of the boat, was performing a gratuitous service to Boles.[47] Finally, there is no evidence that even suggests negligence on the part of Bay Haven Marina. It was stipulated that Bay Haven was not a Trojan dealer and did not receive notice of the manufacturer's recall campaign; there further was no evidence that any person at that marina had actual notice of the campaign or the defect in the F–32.

**D. Negligence on the part of decedents**

The defendant Whittaker, as well as third-party defendants in the case, devoted considerable energy at trial to developing the argument that decedents acted negligently in several respects, and that this negligence was proximately related to their demise. At the outset, it must be noted that traditionally under maritime law, negligence on the part of a plaintiff reduces but does not prevent recovery. *See Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 682 (10th Cir.1981). This standard coincides with the principle of comparative negligence, as it is applied under Michigan law in products liability actions. *See Karl v. Bryant Air Conditioning Co.,* 416 Mich. 558, 331 N.W.2d 456, 462 (1982); *see also* Mich.Comp.Laws Ann. § 600.2949.

The record in this case shows several areas in which decedents' conduct must be carefully scrutinized. As far as the Court is concerned, the most notable of these areas involves the decedents' conduct before their departure from Chicago.

It already has been established that the gas tanks on the Sea Mar were not topped off before the decedents left Chicago. The Court has concluded that decedents logically must have inquired of Boles how much fuel was in the tanks. In light of the late hour in the day, the season of the year, and the fact that according to all accounts the weather was somewhat threatening, the Court finds that it was not reasonable conduct for decedents to have left Montrose Harbor with gas tanks that were only approximately half full, as far as they knew. However, as already has been discussed in connection with Boles' conduct, fuel exhaustion has not been proven to have been a probable cause of the accident. Therefore, this lapse on decedents' part by itself cannot have been a proximate cause of the disappearance.

On the other hand, the facts found by the Court show that the weather on September 25, 1980 was a crucial component of the accident that caused decedents' deaths. Decedents apparently made no specific inquiry into the weather conditions over the lake before they departed from Chicago. At 2:30 (CDT) in the afternoon on that date, however, the National Weather Service had issued a small craft warning for the Illinois and Indiana shores. The account of David Haase shows that several storms had come across the lake during the day. By 4:30 pm (CDT) only one-half hour after the decedents set out from Chicago, the National Weather Service was predicting increasing winds out of the northwest, with waves increasing rapidly to 4–7 feet. Decedents had access to an operable radio on board the Sea Mar, which they undoubtedly could have used to obtain weather reports before and after they departed. Even with all of this information available, however, decedents elected to set out on an extended cruise, in a boat with which they were unfamiliar, on a trip most of which

---

**47.** Bay Haven in its trial brief made the suggestion that, insofar as the decedents' duties with the marina clearly were land-based, application of the federal Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, would be more appropriate than application of the Jones Act. The marina then proceeded to argue that the former statutory scheme would not apply to these particular employees, insofar as the LHWCA expressly excludes any marina workers not engaged in "construction, replacement or expansion" of the marina if those workers are covered by a state workers' compensation law. *See* 33 U.S.C. § 902(3)(C). No party in this case, however, has sought to apply the provisions of the LHWCA to these decedents, and the Court is satisfied that on the facts shown, such an application would not be appropriate.

**764**

would take place after dark. The Court must conclude that in the face of the forecast weather conditions, decedents' decision in this regard was unreasonable, even foolhardy.

Defendant Whittaker has attempted, through its counterclaim filed against plaintiff Anderson, to show that this particular plaintiff, insofar as he was the "captain" of the crew aboard the Sea Mar, is chargeable with individual negligence. On this theory, Anderson would be liable to Whittaker as a joint tortfeasor, with respect to the claims on behalf of the other three decedents. The Court's conclusion of negligence on decedents' part, however, charges them with liability for decisions that the Court only can find were the product of all four crew members. The Court already has discussed the fact that each of the four had extensive boating experience. Each of them would have known of the importance of obtaining current, accurate weather forecasts before departing for an extended voyage, and of pursuing a course of conduct commensurate therewith. Further, each of them would have been aware of the hazards inherent in early autumn weather conditions on the lakes, and of the difficulties of nighttime navigation. In light of their experience, the Court finds that the responsibility for the decision to embark in the face of these perils must lie with each of the four decedents.

*Order*

In light of the foregoing findings and conclusions, the Court hereby ORDERS that judgment be entered in favor of plaintiffs against defendant Whittaker and third-party defendant Boles on the issue of liability. Defendant Whittaker's third-party claims in admiralty against third-party defendants Bay Haven Marina and Ottawa Beach Marina will be DISMISSED. The apportionment of fault among Whittaker, Boles and the decedents is as follows: Whittaker, 55%; Boles, 25%; each decedent, 20%. Beyond those specific amounts, all claims for contribution and/or indemnification filed by Whittaker and third-party defendant Boles are DISMISSED. Whittaker's counterclaim against plaintiff Anderson is DISMISSED. A separate trial will be held to determine the amount of the damage award.

IT IS SO ORDERED.